1914-91, 1915-23, and 1918-67 United States v. Alston Campbell, Jr. et al. Before we begin, I note that the four counsel for the four appellants in this case are all appointed under the Criminal Justice Act and the court appreciates your services. Mr. Willett, we're ready when you are. Good morning, Your Honor, and good morning, Judge Shepard, and good morning, Judge Erickson. If it pleases the court, my name is Al Willett. I'm with the Viner Law Firm in Cedar Rapids. My former associate, Dylan Besser, who is now with RSH Legal and participated on the briefs, is here with me in the conference room. Our position is that the district court committed clear error by limiting the cross-examination of the cooperating witnesses in this case. Alston Campbell, Jr., my client, his rights under the Confrontation Clause were violated by the limiting of the cross-examination by the district court. Because the district court committed reversible error, we believe that Mr. Campbell, Jr. should receive a new trial. All of the defense counsel's ability in that trial, their ability to cross-examine the cooperating witnesses was prohibited by any reference to specific lengths of sentences or specifics to their reduction in sentence for cooperation. Mr. Campbell, Jr. was found guilty of two counts, conspiracy to distribute cocaine base and possession with intent to distribute The issue before this court, your honor, is how do you define for a jury what substantial amount of time and mandatory minimums mean? Those were the two phrases the district court gave us to use in our cross-examination. The defense answer to that question would be we need to be able to quantify the sentences and distinguish amongst the co-conspirators their individual situations. The issue here comes down to how far can these limitations go on an individual's constitutional rights. In this case, there were at least five cooperating witnesses at the first trial. There were four days of evidence that included five cooperators with different backgrounds, motivations, and testimony. As I alluded to earlier, the district court limited the defendants to two phrases, substantial amount of time and mandatory minimums. That was it. Two phrases with very little explanation or meaning to the jury. The extreme that the district court restricted the purpose of the Sixth Amendment Clause renders that right meaningless to an accused individual. With these limitations, there was no ability for a defendant to quantify or distinguish the respective biases of the cooperating witnesses. There was no ability to put forth any substantive evidence or argument as to a witness's credibility. We recognize that the district court has discretion in the extent and limits of cross-examination. However, that discretion is also not without limits. For these reasons, we are asking this court to find that there was an abuse of discretion. This case did go beyond Eighth Circuit case precedent, which is U.S. v. Wright, cutting off any purpose of the Confrontation Clause in this situation. Instead, the district court left the defendants in this case with two phrases to apply to at least the five cooperators as part of the four days of evidence. The and that is not what the case precedent in U.S. Wright stands for. Completely eliminating any ability to quantify the sentences and distinguish the biases and motivations of each witness in this case caused extreme error that impacted the entire trial. Mr. Campbell was significantly prejudiced as a result, and this case must be remanded for a new trial. An example that I'd like to point to the court in the decision of U.S. v. Wright is in U.S. v. Wright, Chief Judge Strand The reference to Chief Judge Strand at page 906 is that in its order denying Wright's motion for a new trial, the district court recognized the tension between these two points of law, but it reiterated its belief that it, quote, appropriately balanced the competing interest, unquote, by allowing defense counsel to ask Anderson whether he faced a mandatory minimum sentence of, quote, decades, unquote, in prison. We were not even allowed to use that term. We could not even use the word decades. That was made very clear when Mr. Erdahl tried to use that word, and there was an objection, and the judge put everybody on notice that that could not be done. There was no, in terms of what the district court would not allow us to do, we could not reference any code sections that increased the sentences of the cooperating witnesses. We could not make any reference to quantities of drugs. We could not make any reference to the exact time of imprisonment the witness was facing. We could not cross-examine them as to the specific lengths of their potential sentences. In other words, we could not say, as I alluded to earlier, you're facing a five-year mandatory minimum. You're facing a 10-year mandatory minimum. You're facing a 20-year mandatory minimum. So, in order to define for a jury what substantial amount of time or mandatory minimums mean, we had to somehow be able to phrase that in a numerical answer, which we were prevented from doing. We believe that there has been a clear abuse of discretion, and because of that limitation of our client's confrontation clause rights, there's been a showing of prejudice to the defendant, and when you take that in, when you look at the confrontation clause, this error was not harmless when you look in the context of the trial as a whole. It's certainly not harmless when the government's evidence was built, in large part, on cooperating witnesses. Excuse me, were you able to reference the maximum length of sentence? We were not, your honor. Thank you. Your honor, I'm told that I have five seconds. I do not want to infringe on my co-counsel, so if the court does not have any further questions, I'm going to hush and let Mr. Johnson go next. Very good. Thank you, Mr. Johnson. Thank you, your honor. Your honor, on behalf of Alston Campbell Sr., and I know that the confusing, but we raised a number of issues. Obviously, the court is aware. I think the most logical place for us to focus is on our issues with the court's denial of being able to use a buyer-seller jury instruction in this case, because ultimately, I think it ties in a lot of the issues that we had with Mr. Campbell Sr. throughout the case. Despite the fact that this was a conspiracy case involving these folks and the allegations put forth from the government was that this was an extensive conspiracy, the amount of any kind of direct evidence against Mr. Campbell is frankly somewhat unique in this case, in my opinion. While there were a number of wiretaps on this case, Mr. Campbell never had a wiretap put upon his phone. Counselor, is your argument consistent with U.S. v. Hester? I believe it is, your honor. Well, that basically says the instruction is not appropriate when there are multiple transactions, and I've been following that since 1998. I agree, your honor, and I think that's why Mr. Campbell Sr.'s issue is unique in this case, because ultimately, Mr. Campbell was not on the wiretaps. He was not surveilled by any police officers. No police actually had any interactions with Mr. Campbell throughout this entire case. They didn't search his home. There was no contraband found in his possession. The one piece of direct evidence that was used against Mr. Campbell at this trial was a controlled buy that occurred that frankly wasn't even controlled. The officers lost surveillance on the vehicle. They never saw Mr. Campbell. They lost any kind of viewing of the confidential informant. They had the confidential informant wearing a wire, and the officer testified that he recognized my client's voice, but again, he never actually spoke with my client during this trial. So, I think that Mr. Campbell Sr.'s specific involvement in this alleged conspiracy, I believe it is supported by a buyer-seller instruction in this specific case, because while there was very limited exposure and surveillance of Mr. Campbell throughout this process, the one even alleged controlled buy was for a total, it was a number of, it was essentially 10 small baggies of drugs that were sold to a confidential informant one time. The officer testified that that was, the amounts were consistent with- Did any cooperator testify that Sr. was involved in more than one transaction? One of the cooperators, Your Honor, testified that he had been dealing with Mr. Senior, Campbell Sr. for years, but was frankly vague and outside the scope of the alleged conspiracy. Who was that? Sorry, Henry. Who was that? Your Honor, if you bear with me, that was Mr., I believe, I apologize, Your Honor. I thought I had that and lost it. That was Thomas Marshall, Your Honor. Okay, thank you. No problem, and just so the court is aware and to be clear, the controlled buy that I was referring to involved an Antoine Franklin. A number of the other cooperators that Mr. Ouellette has already touched upon, obviously, had stated that they had no dealings with him. They were aware of him because of the family involved here, and I think ultimately that's where this issue becomes problematic and why we believe that Mr. Campbell Sr. is entitled to a new trial. Again, we have raised the issues regarding the denial of our motion for new trial and just whether or not the jury verdict was supported by the evidence, but again, I think that this buyer-seller argument brings in everything. Mr. Johnson, is it really your testimony that only one witness identified any transactions with Mr. Campbell Sr.? Because my recollection is that there were actually multiple witnesses that talked about having had buys at certain times, and there were also coded references in the wiretaps that were picked up that seemed to be in the direction of Mr. Campbell Sr., from which someone might have drawn an inference. Am I just misremembering all the evidence? I mean, it's been a while since I've looked at the record. Your Honor, you're absolutely correct about the coded language. That was on the wiretap primarily of Alston Campbell Jr.'s phone. He's Mr. Ouellette's son. There was a number of references to things like ladders and shirts, and it was Agent Furman's testimony that that could be coded language. I would note that the record was very thorough in terms of the one thing that I think was unanimous across the board of everyone who dealt with the Campbells. They were aware of extensive gambling and things along those lines. Coded language would be potentially used there, and the officer testified to that fact as well. Again, frankly, a lot of the conspirators are inconsistent with each other. Mr. Phillips, who was a co-defendant originally who then later cooperated, he testified he didn't have any dealings with Mr. Campbell Sr., but then other witnesses said that they believed Mr. Campbell Sr. was involved because Mr. Phillips had told them, and so obviously that becomes a bell issue with hearsay, but ultimately Mr. Phillips is the most direct line on this, and he is the one who denied that Mr. Campbell Sr. had any involvement. All right. Thank you. Thank you, Your Honor, and Your Honor, again, in the interest of making sure we're keeping on time here, I'm seeing I'm about out, so I would cede to Ms. Arrigus. Very good. Ms. Arrigus? Good morning, Your Honors. It's my honor this morning to appear for my first oral argument in front of this court. I am a latecomer to this appeal. My predecessor in interest is my late law partner, Clemens Erdahl. Mr. Erdahl died suddenly on October 2nd of last year, so although the brief we filed in October bears my name, it was actually a lie. Ms. Erdahl? Thank you, Your Honor. The brief in this case was the last brief written by Mr. Erdahl. We represent Mr. William Campbell, and this morning I'd like to focus on the wiretap issue. Our client is requesting new trial in part, arguing that the court should have granted the motion to suppress wiretap evidence in this case. As the court is well aware, wiretapping is an extraordinary investigatory technique covered under Title III. Wiretap applications have to live up to a high standard in order to be granted. There are two requirements for a sufficient wiretap affidavit under Title III. First, that the government must provide the court a full and complete statement of facts sufficient to allow the judge to make an adequate assessment of necessity. And second, that restricted to the four corners of the affidavit, that the judge must make her own determination of necessity for the wiretap. Wiretapping should only be used where traditional investigative techniques would not suffice to expose the crime, and the judge should have such a full picture from the affidavit as to be able to determine that wiretapping is necessary simply by reviewing it. In the appellant's opening brief, my predecessor in interest described some of the specific deficiencies in the wiretap application and affidavit filed in the government in the Campbell matter. First, that the affidavit lacks a full and complete statement of facts by its own admission, stating that the officer states in the affidavit that he has set forth only the facts that he thinks are necessary to establish the foundation for an order authorizing the interception of wire and electronic communications. So this flies in the face of Title III, simply stating that, well, judge, I've given you what you need. That's not what Title III asks law enforcement and the government to do. What case supports the notion that when an affiant says I've given you what I conclude is necessary, that that's a per se shortcoming under the statute? Your Honor, I don't know that there is a specific case that says that, but rather that it's not so much the statement in and of itself, but law enforcement's confession to having edited his comments to only support a wiretap in this case. But that's true of every warrant application. The law is clear that you don't have to put in inconsistent facts. You have to show probable cause. Why is that any different in the wiretap world? Or what case says it is? It could be. Your Honor, I would be happy to more fully brief the court on this in writing. No, no, we don't need additional briefing. Thank you. Another inconsistency with the wiretap affidavit in this case is that, is this a conclusory statement that the investigation so far had been ineffective in meeting the overall goals of the investigation? This was in spite of the fact that this investigation had been fruitful up until the point of this affidavit being filed. Our client was already involved in at least two controlled buys. They had other cooperating witnesses, which goes to my next point, which is the affidavit states that some of these other cooperating witnesses were not going to be useful in furtherance of the investigation because they were simply retail-level distributors. But the affidavit also describes our client, William Campbell, as a retail-level distributor, which goes to the necessity facet of Title III. What is the necessity in wiretapping the phones of our client, William Campbell? Well, what's your best case on the notion that this has to be target by target, the necessity showing? If you don't show this additional phone is necessary independently, but you do show that because of the state of the investigation and everything else, there's a basis for and reason to believe this one might be fruitful. I thought the case law was pretty clear that the government doesn't have to do it, show necessity phone by phone. Do you have contrary authority? I don't know that I do specifically, Your Honor, but our argument is more that it's that our client in this instance is, at the time the affidavit was filed, he was a daily user of cocaine by his own admission, had a pretty bad drug addiction. There are different competing theories as to what his participation level could have been. Law enforcement seems to be resting on the fact that he is a Campbell and so might know something more, but that's not even articulated specifically as a necessity facet of the wiretap affidavit. But what's the case, the law that says that it has to be done person by person? Because if you think about the way conspiracies work, they often know much about the people that they're getting the wiretap on. What they're trying to figure out is who are they talking to? Who are their sources? We haven't been able to identify the chain up. The way that we can do that is find out where he's getting his daily quantities and the quantities that we know he's selling. We have reason to suspect, because of this familial relationship that may be there, but if it had gone in a totally different direction and it led to somebody in Fargo, North Dakota, that still would have met the requirements and it still would have been necessary. So I'm having a hard time with this idea that you got to go person by person. That seems no more availing than phone by phone. Why am I wrong? Your Honor, I think that Title III and the case law resulting from Title III support the notion that this type of look at this possible person or that possible person. In this case, law enforcement discards the other retail level distributors as not being useful and does not seek wiretap of their phones and doesn't make a showing as to why there would be necessity to do so for our client's phone. I realize that I've run a little bit over my time, and so if the court doesn't have any further questions, I will save the rest of my time to co-counsel. Thank you. Mr. Mullen? May it please the court. Good morning, judges. My name is Dave Mullen, and yes, I was appointed shortly before trial to represent Mr. Willie Carter, who, unlike the other defendants, had a separate trial. He was a single defendant in his trial. I want to look differently at the issue of the buyer-seller instruction issue. In preparing for oral argument, I reviewed the jury instructions in this case, as well as the Eighth Circuit model criminal jury instructions, and I was struck by how frequently the instructions tell a juror what is but also what is not the case. Thus, when we instruct jurors what is evidence, we tell them, well, it's testimony and exhibits, but we also go the extra mile and say, what is not testimony? Statements by counsel, arguments, objections. Likewise, when we have the elements of an offense, we say there are three, four, or five elements for a particular crime, but we don't stop there. We further instruct jurors that being merely present during a crime doesn't make one guilty. We go that extra mile. We stop when it comes to the conspiracy instruction. It goes out for more than one page in this case. It's instruction, I believe, 13, and it gives every which way to Sunday that a person can commit the crime of conspiracy but is scant on information to the jurors as to what is not. It is in this light that Mr. Carter was requesting a buyer sell. Now, in preparing for oral argument, I reread the cases on buyer seller instruction, including refreshing up the research. I noticed that there are several cases that came out this summer. They have one thing in common. It appears that Judge Shepard is part of the panels in those cases confirming the requirement that while it's called a buyer seller instruction, it's been sort of whittled down by the Eighth Circuit to being a single transaction personal use instruction. Mr. Carter, respectfully, is unhappy with the panel decisions in this area. He contrasts the decisions with his request for a jury instruction, which was not one that was just made up out of thin air, but it's actually an instruction that is given in district courts in many states in this country, and that is based on the Ninth Circuit's model instruction, where it deals with the concerns the Eighth Circuit has in its line of cases, in that it says that multiple transactions or a resale, for instance, is inconsistent with it, but it goes further than that and has other what are called relevant factors. Number of sales, resale, any other coordinated efforts, where transactions based on... Counselor, is this a Ninth Circuit case that's in your brief? I don't recall citing a Ninth Circuit case. There is a Ninth Circuit case. Well, I missed the reference. What are you referring to? Who does this model? Where do we find this multi-factor thing that is inconsistent with our case law? Addendum B to my brief has the instruction that we gave at the very bottom of my instruction, my request for instruction, is model instruction. I believe it's 9.19A, but it's in there, Judge, and it is Ninth Circuit settled law. They look at the cases where they've used it. They give the jury the ability to weigh various factors in determining whether this is a buyer-seller issue. I see that I need to reserve the balance of my time for rebuttal. Thank you, Your Honors. Thank you. Ms. Neidl. Good morning. May it please the Court. Emily K. Neidl, Assistant United States Attorney for the Northern District of Iowa, representing the United States this morning. This is a case about a conspiracy to distribute cocaine and cocaine-based, or crack, here in the Waterloo area. This case included a long-term investigation, CIs, surveillance, controlled buys, controlled payments, search warrants, and wiretaps. Before you, to this morning, are four members of the conspiracy that were tried in two separate trials, the three Campbells in one trial and Mr. Carter in another. I want to begin today by addressing a few items that I believe were noted by opposing counsel that are inconsistent with the record. First, with regard to Mr. Williams Campbell's reply brief, unfortunately, as noted, Ms. Argus has the unfortunate position of having to argue a case that she didn't try. In Mr. Williams Campbell's reply brief, it notes that the court improperly relied on Mr. Carter and J.S. with regard to drug quantity, noting that these two didn't testify. It is certainly correct that Mr. Carter didn't testify. He was a co-defendant on a separate trial. I would note that J.S. did testify. That testimony begins at page 513 in the trial. I think potentially counsel confused J.S. and E.S. E.S. testified in Mr. Carter's trial that occurred prior to the sentencing for William. Additionally, William Campbell's reply brief indicates that TFO Furman, the author of the applications for wiretap affidavits, indicated that neither Carter nor J.S. were reliable. I would note that neither of those two individuals are named in the first wiretap application. Mr. Carter was an unknown entity at that point. As his involvement gets discovered during the wiretaps, J.S. is not mentioned by name, but... Why don't we get on to the issue? Why don't we get on to the issues that have been argued? This is not the time to nitpick reply briefs. Certainly, your honor, I merely wanted to make sure that the record was clear. It wasn't an attempt to nitpick, but more clarify the record. Moving on to some things then that were argued this morning in discussions regarding the cross-examination issue, Mr. Ouellette discussed cooperators. My recollection and notes reflect that the issue actually involved four cooperators that had plea agreements. That was JP, AM, and SL. There were some cooperators that also testified that did not have cooperation agreements, those being AF, TM, and JS. I wanted to point out in the record that in this case, the first witness to testify that had a cooperation agreement, that being SL, defense counsel incorrectly, based on the court's prior ruling, actually asked the defendant, don't you face a 10-year mandatory minimum? We'd note that the record at page 82 reflects that there was not an objection, but there was almost an immediate sidebar that was actually asked for by defense counsel. It was reminded that specifics were not supposed to be addressed. Within the record, there is actually some cross-examination of the defense with the specifics of what the mandatory minimum was facing. In this case, with regard to that issue, this was a complex issue. The fact that it was, pardon me, complex is somewhat related on pages 393 through 394. In those pages, there's a discussion outside of the presence of the jury of the cooperator, quite operating witnesses, and what they're facing as far as a potential sentence as well as the defendants. This was a complex issue that had lots to do with different drug quantities, how they were charged, 851 notices, career offender, and would have been a confusing issue. We'd note that in this case, in the Campbell case specifically, both defendants were noted, or two of the three defendants, pardon me, were noted to have prior criminal history. All of the defendants or cooperators, pardon me, that testified could be effectively cross-examined. Their criminal histories were game. Each one of them was cross-examined by three competent attorneys. They were able to be asked about the fact that they had significant sentences that they were facing. Additionally... Is there a particular reason why they would prohibit just the testimony related to the range of sentence? I mean, the maximum sentence is life. I mean, why would that be inappropriate? I mean, I've tried a lot of cases, and I never told anyone they couldn't ask, what's the maximum penalty you're facing? I'm frankly baffled that there's a judge that says that that's somehow prejudicial to whom? I mean, it doesn't make much sense to me. The primary focus of the discussion both times, as this was discussed on the record, was the issue that Defense Counsel wanted to raise was, can we say that they're facing 10 years, 20 years, whatever the case, and because the government can file a motion, it's less than that? The maximum wasn't really an issue that the parties were concerned about because the primary thing that they were trying to address was the bias that gets created by the fact that if I testify successfully, I may get under this mandatory minimum. Why? What is the bias there? What's the problem with that? Well, the bias, Your Honor, would be that obviously, pleasing the government's more likely that the motion gets filed. The concern is that it confuses the jury, and in this case, to the extent- How is it confusing? How? How are they confused? Penalties in general are not an area that typically, well, not typically, the jury is specifically told is not an issue for them. These guys are never being sentenced by, and they're not involved in this particular trial, except for witnesses. It's about bias. This is about motivation. There is an element of bias, certainly. We would concede that. The question is, did the court commit an error by limiting the cross-examination of defense? Well, the question is, did they abuse their discretion more than just committing an error? But, and I get that, but I'm still, I'm just kind of curious as to what's your, what was your argument that this was somehow so horrible and that there's no way that this jury can sort this out that Judge Reed relied upon? In this case, Your Honor, we had the individuals who had plea agreements. The names of their charges were the same as those being faced by the defendants in this case, so it does not take a very clever jury member to figure out that if this defendant is facing a 20-year in the case of A.M. Well, the counsel, that's a different issue, whether the plea agreement details that. I have no problem with, no abuse of discretion, any problem with excluding that. We're being, we're limiting this to why can't, why can't you get, some, the jurors have some notion of the extent of cooperation that, that cooperator hopes to get. Pardon me? What case says that that's wrong? Has any appellate court ever addressed this? Well, Your Honor, certainly this court in cases like Wright has addressed the issue of whether or not a defense counsel can talk about the specifics or whether other language is appropriate. The concern I think here for the court was that the sentences of the defendants were somewhat unknown but would likely overlap the potential penalties. This was an issue that even for these defendants, even for those of us who are knowledgeable, was difficult to ferret through. And quite frankly, at the time someone testifies, we have no idea what their reduction will be. There's not a formula that says if you testify, you get 25% off. Different factors. Doesn't that go to their incentive to provide really, really, really good testimony? Well, hopefully it goes into their incentive to provide really, really, really truthful testimony because ultimately, truthful testimony is what is seen as a benefit as outlined in the case. So ultimately, even if this court decides that Judge Reed abused her discretion in limiting... I got to stay with it. If questions about were you hoping that your testimony would get you more favorable treatment from the government are appropriate cross-exam because they may tell the jury, give the jury insight into a potential motive to do other than tell the truth and the whole truth, then why isn't it even more relevant to get into exactly the extent of the motivational carrot the government has held out? It just seems to be your argument is it flies in the face of the logic of the permissible cross-examination. Well, part of the problem, Your Honor, is again, there's no way to know what will be your reduction. Nobody knows. That's the whole point. Am I going to get prosecution versus no prosecution? That's the greatest incentive and that's perfectly fair game in cross-exam. So the fact that you might get less than 30, less than 20, less than 10. Nobody knows. I'm just hoping. Why isn't all that fair game if the basic cross-examination principle is this is relevant to motive and therefore credibility? Ultimately, counsel was able to ask, are you able to get under a mandatory minimum? And they were able to ask if this was significant. Specific numbers are unnecessary because the jury doesn't... Why didn't you say that in the first place? I apologize, Your Honor, for not leading with that then. But ultimately, counsel was allowed to say, are you able to avoid a mandatory minimum? They were able to talk about substantial. And again, I think the numbers in these cases to a jury are difficult. They don't understand. Well, that's the whole point of their argument is that the word, you know, substantial doesn't mean anything. And to a lot of juries, 30 days in jail might be substantial. And we're talking about decades. Absolutely. But with regard to how the defendants feel about that time is a different question. If you are a defendant in the federal system that's been sentenced before to state census that are 25, 15 years, then your perception of a 10-year mandatory minimum is skewed differently than what the jury is. And so that's a question. But does the jury know that? The jury has the problem with like you face a substantial sentence. The jury has no idea what that means. They do not, Your Honor. They similarly don't know what sort of sentence the particular defendant in this case that they are trying. We go to extreme extents to make sure that they don't know. So that doesn't weigh into their fact determination or ultimately cause some sort of jury nullification issue that they're facing up to life, that they're facing a 10-year mandatory minimum. We specifically don't tell the jury that. And we tell them not to even consider it. Certainly, it's different when we're talking about the bias. But these witnesses were able to be cross-examined. I would note that in these cases, even if the court were, this court were defined. You're distinguishing now bias and motive. Now you've got a nuance that's beyond me. Not intentionally, Your Honor. Certainly, motive goes to bias. It's a form of bias. The district court in her rulings indicated that bias, this was bias. But I would note that even if the judge abused her discretion, in this case, it was harmless. These were witnesses that had multiple other issues that were dealt with and addressed. Two of them had been told and attempted to cooperate and did control bias or control payments with the hope of not being charged. Ultimately, they both still were. They had prior criminal history that came in. One of them, Mr. AM, had some mental disabilities that came in through a record. There were individuals that indicated prior drug use, daily drug use of marijuana. So these weren't witnesses that any indication about their mandatory minimums would have substantially changed the way the jury would have perceived them. They all had issues that were known, and this wouldn't have substantially changed how the jury viewed them. And I would note again, with regard to one, the mandatory minimum was discussed during cross-examination. Was that your initial reference? It sounded like there was a successful objection to that. Your Honor, if you review the record, we didn't actually object. There are many reasons strategically why an objection wasn't made. The record actually reflects. The question is stated, and then I think defense counsel asks for a sidebar. At that time, the court reminds counsel, this is out of bounds. This is not what I previously ordered. And then testimony continues. The jury was allowed to hear something the judge said is out of bounds. Correct. You're saying that cured all errors? I wouldn't. Doesn't sound very persuasive, does it? I wouldn't concede that there was an error, First Your Honor, but I would merely note that to the extent that. You're saying that the jury got all they needed because they got to hear one exchange that the judge told them was out of bounds. The judge didn't actually tell the jury that it was out of bounds. That was during a sidebar. She reminded counsel that it was out of bounds. The jury was not instructed. So the jury heard no comment with respect to this? Correct, Your Honor. And again, strategically, there are reasons for trial. Why didn't you tell us that? My apologies. Again, I attempted to reference page 82. That's where that exchange occurs in the trial record. Again, we would strongly argue that this was a harmless error. And would ask that you not reverse on those grounds. In this case, we had a situation where fire seller instruction was requested. We'd know that the instruction requested as noted previously during argument was not based on Eighth Circuit law. It was based on Ninth Circuit law. We lodged that objection when the proposed instructions were submitted to the court. Ultimately, in this case, the facts also did not support fire seller. Mr. Carter specifically, part of the case against him was that following his arrest, after leaving Mr. William Campbell's residence, was that he gave a lengthy confession. During that confession, he explained that he was part of and was working with the biggest drug dealers in town, the Campbell family, that specifically he was trusted by William Campbell, that he served as a middleman, that he had held onto money. This was completely inconsistent with fire seller. Additionally, with regard to Mr. Campbell Sr. and the fire seller, defense counsel seems to focus on that there was a single controlled buy. That argument would be valid if we were attempting to argue or we were attempting to convict AF of the conspiracy. We were not. We were talking about Campbell Sr. and in this case, with regard to Mr. Campbell Sr., he instead was involved in multiple transactions based on testimony. I had some technical issues during Mr. Johnson's argument, but I don't think it was referenced, but I may have missed it, that AM actually testified to receiving several ounces from Sr. His description was he had done the controlled buys, controlled payments and then controlled buy against JP. He had then returned to drug dealing. He was receiving drugs on a somewhat limited basis, but from William Campbell, there was then an incident where they were gambling. William Campbell wouldn't front him any drugs. And so then Sr. began to front him drugs. And so that testimony also makes this inconsistent with the buyer-seller. Therefore, that instruction would be inappropriate in his case and for him. With regard to Mr. Argus' argument regarding necessity, as the court noted that in cases where wiretaps are received, the government essentially has to prove through the affidavit that at that time we have probable cause that that phone is being used. So the court was right to note that the individuals that we get wiretap applications on are also are often known to have wiretaps. Often have cases that potentially are prosecutable. But it's again, what is the goal of the investigation? In this case, the goal was to build, to go farther, and to find other defendants that were potentially involved to understand the scope and to understand who the sources were. Would note in this case, ultimately, that was somewhat successful in the two different sources, one from Texas and one from Chicago were developed. Additionally, Mr. Carter, his prosecution is largely, if not entirely, based on the wiretap investigation. So it was productive in that there's no requirement in the wiretap statute that either we move up, down, or over with regard to the conspiracy. It's just that other investigative techniques are no longer producing results. Would note in this case that some of the other individuals that were labeled at different points as retail level suppliers had already been cooperating with law enforcement. And at that time, not necessarily known, although in some cases known, they were still dealing with our Campbell family. It would have been to tell the wiretap, for instance, that it was known that John Phillips or JP can continue to provide cash out and cashed out things for Austin Campbell Jr. Ultimately, we would ask that you affirm the district court's rulings in this case the convictions for all four defendants and the other orders. Unless the court has any questions, I will cede the rest of my time. Very good. Thank you. Do appellants have some time? Yes, there it is. You may share it as you like, Mr. Willett. Thank you, Your Honor. And I can see all of the yourself and Judge Shepard and Judge Erickson, and I hope you can see me and hear my voice. To bring some clarification to what this sidebar discussion was, it is laid out in detail at pages 82 and 83 of the transcript. And the end result is we are left with the words substantial and mandatory without defining by number of years. And I think that will give the court a clear indication of the limitations we were placed under. So in essence, Mr. Erdahl brought up 10 years one time, and a length of time was never heard from again. And we were told in no uncertain terms by the district court not to bring it up again. So we were left with the catchphrases that we talked about at the very beginning, substantial amount of time and mandatory minimums. Very quickly, the defense would argue that the government is somewhat trying to change their narrative. That defense counsel wanted to compare the defendant's sentences to the witness' sentences. We never tried to compare the sentences or potential sentences of any of our clients to the sentences of the cooperating individuals. The district court, as you can see, shut down the idea of length by limiting us to a substantial amount of time and or a mandatory minimum sentence. So there was an abuse of discretion, and it's not harmless error. It's not harmless error because our client's confrontation rights were violated, and we couldn't explore the distinctions in these various cooperating individuals. I don't understand if there was thorough cross-examination of witnesses who conceded they were hoping to get significant help from, that their cooperation would produce substantial benefits. It seems to me it takes an awful lot to show that our error isn't harmless in a trial of this scope and width. I hope I'm answering the court's question, Your Honor, when I say their hope and belief for a reduction in sentence had no context to it. We didn't know who was... You're fading out. You're fading away from your mics for some reason. I apologize, Your Honor. Can you hear me now? Better yet. I believe the answer to the court's question is there was no context to these cooperating individuals in terms of, obviously, they wanted a reduction. Obviously, they were hoping for a good result. But the jury didn't know who had the five-year mandatory minimum. Who had the 10-year? Who had the 20? Was somebody a career offender who may be looking at 30 years to life? Wait a minute. Wait, wait, wait, wait, wait. Didn't the jury hear that all of them, to the extent it was true, looked forward to a substantial amount of time being gained? Your Honor, they heard that. I don't care about the 10-year max. I'm saying why isn't that... Given the scope of the cross-examination, I suspect I will read in due course. I don't understand why the existence of a mandatory minimum, that's just fluff for defendants to create confusion. It's the substantial amount of time is the motive. You've got to have something more than, well, in the context, we didn't know which cooperator was going to get how big a mandatory and so forth. That just doesn't do it for me, frankly. Your Honor, I'd like to bring you back to two concepts that were articulated in the Wright decision. U.S. v. Caldwell was mentioned at page 907 of the Wright decision where there was a reference to the district court abusing its discretion in limiting cross-examination where it prohibited any reference conveying the severity of the 10-year mandatory minimum sentence that the cooperating witness would have faced. Instead, it allowed only a vague suggestion that the dropped charge may have called for quote, time in the penitentiary, unquote. And I'd also like to bring your attention to the reference to Yang v. Roy in the Wright decision at page 906. The accused should be able to contrast the original punishment faced by the witnesses with more lenient punishment contemplated by the plea agreement. Your Honor, the government's argument relies on a fundamental contradiction. They claim that it was necessary for the district court to limit cross-examination in the sentence reductions because more information would unduly influence the jury. But at the same time, they claim that this additional information would not have left the jury with a significantly different impression of the witness's credibility. Our argument is they can't have it both ways. Thank you, Your Honor. I see that my time is up. Very good. Thank you, counsel. The cases have been thoroughly briefed and well-argued this morning, and we'll take them under advisement.